IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:20-CR-83 |
| | § | Judge Heartfield |
| | § | |
| WILLIAM GLENN CHUNN, | § | |
| a/k/a "BIG HEAD"; (1) | § | |
| KEVIN SCOTT KENT, | § | |
| a/k/a "BIG KEV"; (3) | § | |
| JESSE PAUL BLANKENSHIP; | § | |
| a/k/a "JP"; (5) | § | |
| TIMOTHY LONG, | § | |
| a/k/a "TIMMY" (6) | § | |

## GOVERNMENT'S TRIAL BRIEF

The government, acting through undersigned counsel, submits this trial brief to provide the Court with an overview of the charges against the defendants, a summary of the relevant facts, the evidence the government intends to present in its direct case, a legal overview of the charges against the defendants, the evidentiary bases for the admission of the government's evidence, and analysis of various evidentiary and logistical issues that may come up at trial. Trial is set for October 25, 2021.

## I. CHARGES AGAINST THE DEFENDANTS

The superseding indictment ("indictment"), returned July 8, 2021, charges the four above-captioned defendants—William Glenn CHUNN, a/k/a "Big Head," Kevin Scott KENT, a/k/a "Big Kev," Jesse Paul BLANKENSHIP, a/k/a "JP," and Timothy LONG, a/k/a "Timmy"—with conspiring to conduct and participate in the affairs of the Aryan

Circle ("AC"), a violent criminal enterprise associated in fact, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) ("RICO conspiracy"). ECF No. 231.

In addition to RICO conspiracy (Count One), the indictment charges Defendants KENT, BLANKENSHIP, and LONG, respectively, with violent crimes in aid of racketeering. Count Two charges defendants KENT and BLANKENSHIP with kidnapping in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 for the kidnapping and patch burning of J.J. in or about March of 2016 near St. Louis, Missouri. *See* Indictment at ¶¶ 7(OA-10), 10-12. Count Three charges the same defendants with conspiracy to commit kidnapping in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5) for the same incident. *See* Indictment at ¶¶ 7(OA-10), 13-14.

Count Four charges defendant LONG with attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5) for the stabbing of B.L. on or about July 17, 2018 inside of a federal prison located in Pennington Gap, Virginia. *See* Indictment at ¶¶ 7(OA-22), 15-16. Finally, Count Five charges defendant LONG with attempted murder and assault with a dangerous weapon in aid of racketeering for the stabbing of M.Q. at a federal prison located in Pennington Gap, Virginia on September 11, 2018. *See* Indictment at ¶¶ 7(OA-25), 17-18.

## II. SUMMARY OF RELEVANT FACTS

Beginning in at least 2010 and continuing through the date of the indictment, the defendants were members of a violent, race-based, "whites only" gang known as the Aryan Circle ("AC"). The AC started in 1985 within the Texas prison system and grew to a

membership of hundreds, operating both inside and outside of state and federal prisons throughout the country. As part of the criminal enterprise, AC members and associates engage in narcotics distribution, firearms trafficking, and violence including acts involving murder, assault, robbery, witness intimidation, and kidnapping. The purpose of these activities is to benefit the AC and its members financially, to assert the gang's dominance over rivals, and to maintain order and discipline over its members, among other gang-related motivations.

The AC has a militaristic hierarchy and organizational structure. Much of the AC's rules, procedures, and codes of conduct are disseminated through a written "Constitution" or "C-Note," along with additional guidelines passed between members. The rank structure evolved over time, but generally, a five-member "Upper Board" directs and oversees the operations of the AC. Each Upper Board seat corresponds to a different branch of the organization. The names and number of branches has also evolved over time. Certain highly respected members, proving themselves both loyal and violent, are selected for the "Task Force" and are assigned tasks, such as performing a "hit" (kill order) or another act of violence. Under each Upper Board member are specific ranks and positions within the chain of command. Subordinate members are required to follow orders. Failure to follow orders is met with punishment.

The AC employs a robust symbology, utilizing Nazi-inspired symbols and artwork to demonstrate affiliation. Upon gaining entrance—typically through "putting in work" (committing an act of violence)—a "prospect" (prospective member) earns his "patch." The "patch" is a circular tattoo, typically with the letters "A" and "C" and a swastika. By

committing an act of violence or displaying loyalty, a member can earn additional "patches" or tattoos. Membership in the gang is typically for life, but leaving involuntarily (through failure to follow orders or other acts requiring discipline) can result in the violent removal of one's patch, through burning or cutting it off.

In furtherance of the Aryan Circle enterprise, members and associates carry out violent acts and organized criminal activities. Several murders were committed by AC members, including the 2012 shooting murder of Jamie Czeck in Fort Smith Arkansas, and the 2016 shooting murder of Clifton Hallmark in Turkey Creek, Louisiana. *See* Indictment at ¶ 7(OA-3; OA-13). KENT agreed that Czeck should be murdered for attempting to join another gang and traveled to Louisiana after Hallmark's murder to help "clean up." *See* Indictment at ¶ 7(OA-2; OA-13). AC leaders also issue kill orders or "hits," including ones ordered by the defendants during the period of the conspiracy but not carried to completion. One such example was KENT's order to kill an AC member he deemed a "security threat"; a hit he communicated to several members of the Task Force.

In prisons, where firearms are unavailable, AC members command the respect of rival gangs and remove their own members by committing stabbings using home-made weapons commonly referred to as "shanks." Such attacks include, but are not limited to: the June 8, 2010 stabbing at a federal prison in Talladega, Alabama of rival gang members (R.S. and J.J.) by an AC member as ordered by CHUNN (Indictment at ¶ 7(OA-1)); the November 22, 2014 stabbing of a rival Aryan Brotherhood member (M.C.) at a federal prison in Inez, Kentucky ordered and supervised by CHUNN (Indictment at ¶ 7(OA-6)); the brutal, hate-motivated August 17, 2017 stabbing of M.M. at a federal prison in Yazoo

City, Mississippi as ordered by CHUNN because CHUNN determined that he would not "walk the yard with" (live in proximity to) a homosexual man (Indictment at ¶ 7(OA-18)); and the two 2018 stabbings of Aryan Brotherhood members and associates (B.L. and M.Q.) that LONG carried out at the behest of AC leaders including CHUNN at a federal prison in Pennington Gap, Virginia (Indictment at ¶ 7(OA-22; OA-25). Several of these attempted murders were part of an ongoing battle between the AC and a rival, "whites-only" gang known as the Aryan Brotherhood.

Membership in the AC is generally a lifelong commitment. But members can be "X'd" (removed) for cause, which is sometimes accompanied by removal of the member's gang tattoo or "patch." Two instances of the violent removal or attempted removal of a gang tattoo were the November 9, 2013 patch burning of Christopher Baker in Jefferson County, Missouri, ordered by KENT, and the March 2016 kidnapping and patch burning of Jerry Jones near St. Louis Missouri conducted by KENT and BLANKENSHIP. *See* Indictment at ¶ 7(OA-4; OA-10).

The Aryan Circle also engages in narcotics trafficking, both inside and outside of prisons, to support its criminal aims. Between August 2015 and November 2016, for instance, an AC member transported large quantities of methamphetamine through the Eastern District of Texas to Louisiana for distribution. *See* Indictment at ¶ 7(OA-9). The evidence at trial will also show that AC members in other states, such as Missouri, distributed methamphetamine, including BLANKENSHIP. Within the federal prison system, AC members possessed or sold quantities of controlled substances such as suboxone or synthetic cannabinoids ("K2"). *See, e.g.*, Indictment at ¶ 7(OA-17). AC

members and associates in the "free world" also smuggled or attempted to smuggle these valuable controlled substances to incarcerated members to provide inmates with a source of income.

To avoid law enforcement detection, AC members strictly enforce the gang's rule against "snitching." For example, CHUNN ordered another AC member to kill the victim of a violent patch-burning because CHUNN believed the victim was talking to law enforcement. CHUNN also committed a retaliatory attack against another inmate (J.K.) on May 7, 2015, at a federal prison in Lewisburg, Pennsylvania, because he believed J.K. was cooperating with law enforcement. *See* Indictment at ¶ 7(OA-7). One way to determine whether members or witnesses are cooperating is to collect and disseminate their "paperwork" (often through accessing PACER or viewing discovery). Following the disclosure of discovery in the murder of Clifton Hallmark—which was prosecuted as a VICAR in the Western District of Louisiana—CHUNN devised a plan to kill a cooperator. Destroying or concealing evidence and attempting to disrupt investigations is also a part of this pattern of obstruction. Evidence of KENT's obstructive conduct, for instance, will include KENT's directing a girlfriend to destroy pictures and taunting investigators working the crime scene after the Hallmark homicide. *See* Indictment at ¶ 7(OA-13).

## III. ANTICIPATED TESTIMONY AND EVIDENCE

At trial, the government plans to call over 50 witnesses and introduce approximately 500 exhibits in its case-in-chief. Various categories of witnesses and types of evidence will be introduced to meet the government's burden of proof to include, but not limited to: enterprise witnesses, event witnesses, forensic and medical experts, law enforcement

witnesses, physical exhibits, demonstrative exhibits, and audio and video exhibits. There will be some natural overlap in these categories.

Many of the witnesses whom the government will call to testify about the Aryan Circle enterprise are cooperating former gang members, whose testimony will cover their own personal progression within the AC, as well as their dealings with the trial defendants and the underlying crimes in which AC members engaged. Enterprise testimony will be accompanied by physical, audio, visual, and video exhibits, as well as communications—mostly intercepted wiretap audio calls and text messages, recorded inmate calls and emails, and letters collected by prison staff or retained by witnesses and cooperators. Enterprise evidence and testimony will also include proof of the background and history, purpose, means and methods, hierarchy, and structure of the Aryan Circle enterprise and its racketeering activities.

Additionally, cooperators, civilian witnesses and victims, and law enforcement officers will be called to testify about substantive counts and overt acts, both those alleged in the indictment and those that are more broadly part of the racketeering activities of the AC or relevant to demonstrating the trial defendants' membership in the enterprise. Witnesses will testify about specific incidents of murder, attempted murder, kidnapping, drug dealing, and other crimes committed by AC members, including the trial defendants. Supporting evidence will also include physical, audio, visual, and video exhibits such as weapons (inmate-constructed knives known as "shanks"), injury photographs, correspondence as described above, surveillance video from federal prisons, and medical records.

For some of these substantive and overt acts, expert witnesses in the fields of forensic and medical sciences will be called to testify. Notice of experts the government intends to call, their qualifications (or curriculum vitae), and areas of specialty was provided to defense counsel on June 22, 2021 and August 30, 2021. The fields to be covered will include medicine and surgery, nursing, firearm/toolmark examination and identification, drug trafficking, forensic pathology, and drug identification and analysis.

The conduct covered at trial will date back to at least 2010. As such, members of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Houston Police Department, and the Texas Department of Public Safety ("DPS"), who have been investigating the Aryan Circle and its members and associates since approximately 2016 will provide overview and summary testimony. Specifically, the government intends to call ATF Special Agent Robert Bodin and DPS Special Agent Kevin Hunt in this capacity. Accompanying their testimony will be demonstrative exhibits such as organizational charts to aid the jury, as described in more detail below.

## IV. LEGAL OVERVIEW

### A. The Racketeer Influenced and Corrupt Organizations Act (RICO)

RICO was enacted as Title IX of the Organized Crime Control Act of 1970. *See* Pub. L. No. 91-452, 84 Stat. 941 (1970). By enacting RICO—in response to the growing threat from organized crime—Congress "clearly demonstrate[d] that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26-27 (1983). Indeed, Congress expressly directed that "[t]he provisions of this Title shall be liberally

construed to effectuate its remedial purposes," 84 Stat. 947, and courts have consistently heeded this directive. *See, e.g.*, *Russello*, 464 U.S. at 26-27; *United States v. Turkette*, 452 U.S. 576, 587 (1981).

The defendants are charged with RICO conspiracy, under 18 U.S.C. § 1962(d), which makes it unlawful, *inter alia*, to conspire to violate § 1962(c). Put simply, "[t]o prove RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense [Section 1962(c)] and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

Section 1962(c) provides, in pertinent part, that:

> It shall be unlawful for any person employed by or associated with any enterprise to be engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c); *see also Salinas v. United States*, 522 U.S. 52, 62-65 (1977) (enumerating the elements of the RICO substantive offense and RICO conspiracy). In turn, to prove RICO conspiracy in violation of Section 1962(d), the government must establish that:

> (1) the criminal enterprise existed;
> (2) the enterprise was or would be engaged in, or its activities affected or would affect interstate or foreign commerce;
> (3) a conspirator was or would be "employed by" or "associated with" the enterprise;
> (4) a conspirator did or would conduct or participate in, either directly or indirectly, the conduct of the affairs of the enterprise; and

(5) a conspirator did or would knowingly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (as described in the indictment); that is, a conspirator did or would commit at least two acts of racketeering activity.

*Id.; see also United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (discussing elements of RICO conspiracy).

A RICO conspiracy does not require that the conspirator agree to personally commit the underlying racketeering acts, *Salinas*, 522 U.S. at 62-66. Adopting the theory of co-conspirator liability enumerated in *Pinkerton v. United States*, 328 U.S. 640, 646 (1946), the Court in *Salinas* observed that "[t]he partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Salinas*, 522 U.S. at 63-64. No overt act is required to satisfy a RICO conspiracy, nor is the government required to prove that each conspirator agreed that he would be the one to commit two predicate acts. *Id.*; *see also United States v. Glecier*, 923 F.2d 496, 499-500 (7th Cir. 1991). Further, it is not necessary to prove that any defendant committed even a single racketeering predicate as a result of the conspiracy. *See United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) ("[A] RICO conspiracy charge need not specify the predicate racketeering acts that the defendant agreed would be committed."). Furthermore, "[b]ecause conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established solely by circumstantial evidence. The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy may all be inferred from the development and collocation of

circumstances." *Posada-Rios*, 158 F.3d at 857 (internal citation and quotation marks omitted).

An "enterprise" includes either a legal entity or an association-in-fact enterprise, 18 U.S.C. § 1961(4), which has a formal or informal organization and whose associates function as a continuing unit. *See United States v. Boyle*, 556 U.S. 938, 944-45 (2009). "The very concept of an association in fact [enterprise] is expansive." *Id.* Hallmarks of association-in-fact enterprises are structural features such as "a [common] purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 946; *see also United States v. Elliot*, 571 F.2d 880, 898 (5th Cir. 1978) (defining "enterprise" as a broad term which can encompass "an amoeba-like infrastructure that controls a secret criminal network" and be inferred from "largely or wholly circumstantial evidence"). The charged enterprise in this case is the Aryan Circle, a nation-wide organization with a common purpose, relationships among and structure to its membership, and a history and mythology that forms the basis of many of the enterprise's standardized rules and animates much of its criminal activity.

The enterprise's effect on interstate commerce need only be *de minimis*. *See United States v. Speed*, 1995 WL 29266 at *3 (5th Cir. 1995) (applying the reasoning in *United States v. Shively*, 927 F.2d 804, 808 (5th Cir. 1991) to RICO). Courts take an expansive view on what conduct is enough to meet the *de minimis* standard. *See, e.g.*, *Delgado,* 401 F.3d at 297 (enterprise engaged in trafficking drugs obtained outside United States, and members used telephones, pagers, Western Union, and U.S. Postal Service to conduct enterprise's affairs); *Speed*, 1995 WL 29266 at *3 (murder over drug debt, drug trafficking,

and use of cellphones sufficient). Here, the government's evidence will establish that AC members engaged in the distribution of controlled substances; used interstate facilities, such as phones and email, to commit and attempt to commit murder; used interstate wires to send money to incarcerated enterprise members; used interstate facilities, such as phones and email, to coordinate crimes between and among members; and used firearms and ammunition that moved in interstate commerce to commit crimes and protect the enterprise.

To be "employed by" or "associated with" the enterprise should be given its common, plain meaning. This does not require the defendant to be "involved in management" or occupy a formal position within the criminal organization. *United States v. Martino*, 648 F.2d 367, 402 (5th Cir. 1981). Rather, "employed by" can mean the defendant, by way of example, performs services for the enterprise, has an interest in its operation, *or* has a position within it. *See United States v. Gabrielle*, 63 F.3d 61, 68 (1st Cir. 1995) (defining "employed by"); *United States v. Console*, 13 F.3d 641, 654 (3d Cir. 1993) (same). Relatedly, "associate with" as stated in Webster's Third New International Dictionary (1971) ed.), can mean "to join, often in a loose relationship as a partner, fellow worker, colleague, friend, company or ally." The bar is not particularly high and can be proven by circumstantial or direct evidence, often overlapping with proof of the defendant's culpability under other elements of RICO conspiracy.

The RICO statute defines racketeering activity as certain crimes chargeable under state law and federal crimes indictable under listed federal statutes. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity,

one of which occurred after [October 5, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "A 'pattern' is an 'arrangement or order of things or activity,'" but Congress "intended to take a flexible approach and envisioned that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a pattern of racketeering activity, the government "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis in original).

Under this flexible approach to relatedness and continuity, the government may establish the requirements "in a variety of ways." *Id.* at 241. As to relatedness, the racketeering activity must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and not isolated events." *Id.* at 240. And the bar is not high: acts are related so long as they are "'committed in furtherance' of the enterprise, or if they had the same purpose." *United States v. Gilmore*, 590 F. App'x 390, 404 (5th Cir. 2014) (quoting *Delgado*, 401 F.3d at 298).

As to continuity of the enterprise—a necessarily temporal concept—it may be demonstrated "over a closed period by proving a series of related predicates extending over a substantial period of time" *or* over an open-ended period by proving "past conduct that by its nature projects into the future with *a threat of repetition*." *H.J. Inc.*, 492 U.S. at 241-

42 (emphasis added); *see also Word of Faith World Outreach Ctr. Church v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996). "[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.*, 492 U.S. at 242-43.

Courts have explicitly held that a RICO indictment need not allege a pattern of racketeering activity that consists of specific racketeering acts and that the jury is not required to find that a defendant agreed to the commission of a specific racketeering act. *Glecier*, 923 F.3d at 500; *United States v. Phillips*, 874 F.2d 123, 128-30 (3d Cir. 1989). In *Glecier*, the RICO conspiracy count alleged that the defendant agreed to conduct and participate in the conduct of the affairs of the enterprise, directly and indirectly, through a pattern of racketeering activity consisting of multiple acts of bribery. 923 F.2d at 498. The Seventh Circuit held that these allegations were sufficient to allege a RICO conspiracy and that the indictment need not allege "overt acts" or "specific predicate acts that the defendant agreed personally to commit." *Id.* at 500. The Seventh Circuit added:

> By specifying the time period during which the alleged conspiracy operated, the locations and courts, the principal actors, and with some detail, the specific types of predicate crimes to be committed and the modus operandi of the conspiracy, the indictment adequately enabled [the defendant] to prepare a defense.

*Id.* at 500; *accord United States v. Crockett*, 979 F.2d 1204, 1208-10 (7th Cir. 1992) (holding that *Glecier* RICO conspiracy charges need not allege specific racketeering acts, but noting that RICO conspiracy count, nonetheless, "alleged acts of violence carried out

during a specified period of time for specific purposes in furtherance of the delineated activities of the RICO enterprise").

### B. Violent Crimes in Aid of Racketeering (VICAR)

Congress passed the Violent Crimes in Aid of Racketeering (VICAR) statute, 18 U.S.C. § 1959, to complement RICO. *United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir. 1992). The VICAR statute provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" engages in one of the predicate VICAR crimes "in violation of the laws of any State or the United States . . . shall be punished" as set out in the subparts of § 1959(a). 18 U.S.C. § 1959(a). The VICAR statute has the same definitions of "enterprise" and "racketeering activity" as RICO. *Compare* 18 U.S.C. § 1959(b)(2) *with* 18 U.S.C. § 1961(4); *see also Concepcion*, 983 F.2d at 380.

To establish a VICAR violation, the Government must prove that: (1) the organization was an enterprise; (2) the enterprise engaged in, or its activities affected, interstate or foreign commerce; (3) the enterprise engaged in racketeering activity as defined under RICO law; (4) the defendant in question committed, or aided and abetted, the charged crime of violence—in this case, kidnapping, conspiracy to commit kidnapping, attempted murder, or assault with a deadly weapon; and (5) the defendant's purpose in committing that crime of violence was to maintain or increase his position in the enterprise. *See United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012) (quoting *United States v. Stinson*, 647 F.3d 1196, 1204 (9th Cir. 2011)).

"Self-promotion" within the gang "need not be the defendant's sole or primary purpose" when carrying out a crime of violence. *Id.* at 450 (quoting *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997)), *overruled on other grounds by United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998). Rather, it is sufficient that the violent act was committed "'as an integral aspect of membership' in such enterprises." *Concepcion*, 983 F.2d at 381 (quoting S. REP. NO. 98-225 at 304). This means that the motive requirement is satisfied where "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.*

The indictment alleges three incidents in four separately charged VICAR offenses: (1) the kidnapping of (and conspiracy to commit the kidnapping of) J.J. by KENT and BLANKENSHIP (Counts Two and Three); (2) the stabbing of B.L. by LONG (Count Four); and (3) the stabbing of M.Q. by LONG (Count Five).

## V. ADMISSIBILITY OF THE GOVERNMENT'S ANTICIPATED EVIDENCE

### A. Evidence of Defendants' Incarceration

As alleged in the indictment, the Aryan Circle originated in the Texas state prison system and many of its members, including the defendants, participated in the gang while incarcerated. Generally, the government would not reference a defendant's custodial status during trial. However, the fact that Aryan Circle members, associates, victims, and rivals are members of prison gangs, and the fact that many of the alleged overt acts in this case took place within prisons, makes testimony that the defendants were incarcerated at various points during the charged conspiracy unavoidable and highly probative.

"[E]vidence of other criminal acts or prior trouble with the law [such as being incarcerated] is admissible if the evidence is substantially relevant for some purpose other than to show a probability that the defendant committed the crime for which he is being tried because he is a man of criminal character." *See United States v. Sutherland*, 463 F.2d 641, 649 (5th Cir. 1972) (permitting evidence that the defendant was jailed when he gave conspirator tutorial on how to rob banks; testimony was relevant "to show the dominating influence" of defendant and his "close relationship" to his co-conspirator). Evidence that the defendants were incarcerated at various points during the conspiracy is not meant to show propensity for criminal activity, but rather to provide context to conversations as well as the locations of such conversations, prove up acts that are inexplicably intertwined with the crimes charged, and establish the existence of, and the defendants' association with, the Aryan Circle. This is exactly the other type of "substantially relevant purpose" contemplated when allowing such information to be presented at trial.

Such evidence also generally does not violate Federal Rule of Evidence 403. *See, e.g.*, *United States ex. rel. Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973) (defendant appearing in prison clothing not prejudicial where "jury necessarily knew that he was a prison inmate both at the time that he was alleged to have committed the crime and at the time of his trial"); *United States v. Arayatanon*, 980 F.3d 444, 450-51 (5th Cir. 2020) (testimony that calls were recorded while defendant was in jail was "not unfairly prejudicial under the circumstances"). Indeed, any risk of prejudice can be cured with a limiting instruction. *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *accord United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010).

## B. Uncharged Acts Demonstrating Conspiratorial Agreement Do Not Implicate Rule 404(b)

The government has charged the defendants with RICO conspiracy and a number of specific overt acts in furtherance of that conspiracy. The government's evidence at trial, however, is not limited to proving overt acts specifically alleged in the indictment. It is well-settled that courts take an expansive view of evidence of conspiratorial agreement and that such conduct is not "other acts" evidence under Federal Rule of Evidence 404(b).[1] In this case, uncharged acts relevant to the existence of and agreement to join the charged enterprise are not "extrinsic" at all. Rather, this evidence is intrinsic to the charged RICO conspiracy, because it shows the nature of the charged criminal enterprise and the requisite pattern of racketeering activity.

The Fifth Circuit appropriately places few limitations on the presentation of enterprise evidence. "Evidence of an uncharged offense arising out of the same transactions as the offense charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)." *United States v. Krout*, 66 F. 3d 1420, 1425 (5th Cir. 1995) (internal quotation marks omitted). "The government is not limited in its proof of a conspiracy or

---

[1] *See, e.g., Reese v. United States*, 353 F.2d 732, 734 (5th Cir. 1965) (quoting *Kolbrenner v. United States*, 11 F.2d 754, 756 (5th Cir. 1926) (holding that the government is "not limited to proving the overt acts alleged in the indictment, but could show any act of the conspirators, occurring during the life of the conspiracy, for the purpose of proving" the existence of the conspiracy or agreement thereto); *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001) (finding that uncharged acts, even where prejudicial – such as murders and attempted murders – are properly introduced when taken in furtherance of the conspiracy), *opinion withdrawn in other part on rehearing by* 309 F.3d 274 (5th Cir. 2002); (upholding the admissibility of uncharged murders and attempted murders under Rule 403 of the Federal Rules of Evidence because "it was necessary for the jury to understand the brutal nature of the conspiracy."); *United States v. Castillo-Chavez*, 555 F. App'x 389, (5th Cir. 2014) (explaining that "extrinsic evidence" may be admitted for the purpose of proving a defendant's "knowledge of and intent to participate in the charged conspiracy.").

racketeering enterprise to the overt or racketeering acts alleged in the indictment." *Id*. Thus, uncharged acts which tend to prove an element of RICO conspiracy are not "character evidence" but proper and inherent to the means and methods of the alleged enterprise. *Id*. A paragon of conspiracy law is that these acts need not even constitute a crime. *See, e.g.*, *Castro v. United States*, 296 F.2d 540, 542-43 (5th Cir. 1961).

Examples of courts taking an expansive view of enterprise evidence abound. *See, e.g.*, *United States v. Santibanez*, 812 F. App'x 207, 210 (5th Cir. 2020) (holding no prejudice where former gang members testified about gang's uncharged involvement in arson and four murders for purpose of showing that gang was an enterprise engaged in racketeering activities); *United States v. Ahedo*, 453 F. App'x 544, 547-49 (5th Cir. 2011) (finding that an uncharged murder was not extrinsic to charged conspiracy, because victim was murdered for failure to pay drug debt, which was relevant to existence of RICO enterprise and defendants' participation in said enterprise); *United States v. Rivera*, 147 F. App'x 408, 409-10 (5th Cir. 2005) (permitting testimony of crimes – including murder committed by another defendant – where "a rational jury could have linked that murder with the enterprise" and "witnesses testified to the enterprise's involvement in and reasons for the murder.").

Evidence of the existence of and the defendants' participation in the Aryan Circle enterprise is not only relevant, but integral to proving the charged offenses. At trial, the government intends to introduce evidence and testimony related to uncharged acts demonstrating the defendants' association with and membership in the Aryan Circle, as well as evidence of the pattern of racketeering activity in which the enterprise engaged.

### C. Gang Tattoo Evidence Is Admissible as Non-Testimonial Evidence of the Enterprise and the Defendants' Association with the Enterprise

For RICO conspiracy, the government must prove, in part, that the defendant knew of and agreed to the overall objective of the enterprise. *Posada-Rios*, 158 F.3d at 857. Evidence of knowledge and agreement includes indicia of membership in the criminal organization. In gangs such as the Aryan Circle, tattoos are one such indicator. In *Velasquez*, the Fifth Circuit firmly upheld the relevance of introducing the defendants' gang tattoos for the purpose of showing their employment and association with the enterprise. 881 F.3d at 336. The Court even found that asking the defendants to appear shirtless before the jury was more probative than prejudicial of this crucial element of the RICO offense. *Id*. The Court also dismissed the defendants' claim that the tattoos violated their right against self-incrimination, finding that tattoos are more akin to physical evidence than compelled testimonial evidence. *Id*. at 338. Because of the direct relevance of the defendants' gang tattoos, their admission into evidence—whether by photograph or by in-court demonstration—is not unfairly prejudicial.

### D. Application of the Hearsay Rules

Several evidentiary issues that may arise during trial involve application of the hearsay rules. The government summarizes these issues below.

#### 1. Statements of the Defendants

The government intends to introduce statements made by the defendants in different circumstances and formats including, but not limited to, recorded jail calls, intercepted wiretap communications, interviews, letters, and emails. Such statements are admissions

of a party opponent, are excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A) and are therefore not subject to the bar on hearsay.

### 2. Defendants May Not Offer Their Own "Self-Serving" Hearsay Statements

The government will not seek to introduce every statement each defendant has made. To the extent the defendants may seek to offer their own out-of-court statements, those statements remain inadmissible hearsay pursuant to Rule 801(d)(2), which excludes from the definition of hearsay only the statements of a party that are offered *against* that party. Fed. R. Evid. 801(d)(2).

Out-of-court statements not offered by a party opponent are inadmissible hearsay. *See, e.g.*, *United States v. Branch*, 91 F.3d 699, 729 (5th Cir. 1996). Even if the government excises portions of a defendant's statement, neither the rule of completeness nor any other evidentiary convention require that the entire statement be presented to the jury. *Id*. (citing Fed. R. Evid. 106, which allows for the admission of the remainder of related written or recorded statements under certain circumstances); *see also United States v. Herman*, 997 F.3d 251, 263 (5th Cir. 2021) (applying the holding in *Branch* and excluding statements offered by defendant as inadmissible hearsay). Because the defendants' statements are hearsay if not offered against them and no exception enumerated in the rules would otherwise permit their introduction, the defendants may not admit such statements.

### 3. Co-conspirator's Statements in Furtherance of the Conspiracy

The government intends to introduce statements made by co-conspirators during and in furtherance of the conspiracy. Such statements are excluded from the definition of hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E).

Out-of-court statements of one conspirator, made in furtherance of an on-going conspiracy, are admissible against any other co-conspirator or trial defendant. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The government may admit a co-conspirator statement upon a showing that: (1) a conspiracy existed; (2) the co-conspirator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); *see also United States v. Ebron*, 683 F.3d 105, 135 (5th Cir. 2012).

The trial court is not required, however, to hold a pretrial hearing on these foundational requirements before admitting a co-conspirator statement. *See United States v. Fragoso*, 978 F.2d 896, 900 (5th Cir. 1992) (approving the "district courts' practice of carrying a motion to challenge the admission of co-conspirator statements [a "*James* motion"] through trial or at least through presentation of the government's case until a determination of the existence of the Rule 801(d)(2)(E) predicate facts can be appropriately made"); *see also United States v. Lechuga*, 888 F.2d 1472, 1479 (5th Cir. 1989) (denying motion to exclude co-conspirator statements "at the *close* of the government's evidence") (emphasis added). When or how to hear such a challenge is within the broad discretion of the trial court. *See United States v. Gonzalez-Balderas*, 11 F.3d 1218, 1224 (5th Cir. 1994). On review, the Fifth Circuit instructs court to, at some point in the record, make findings as to the predicate facts required by Rule 801(d)(2)(E). *Fragoso*, 978 F.2d at 900-01. All that is required is that the evidentiary factors are supported by a preponderance of the evidence. *Id*.

To be considered "in furtherance of the conspiracy," the "statement itself or the conversation as a whole" should be "intended to advance, facilitate or promote the ultimate conspiratorial objective." *Ebron*, 683 F.3d at 135-36 (quoting *United States v. Cornett*, 195 F.3d 776, 783 (5th Cir. 1999) (internal quotation marks omitted)). The Fifth Circuit does not interpret the "in furtherance" requirement too strictly. *Cornett*, 195 F.3d at 782. The existence of the conspiracy itself need only satisfy the court that the evidence is "credible and sufficient to support a finding of a joint [criminal] undertaking." *United States v. Martinez*, 481 F.2d 214, 221 (5th Cir. 1973).

Who is part of the conspiracy is also interpreted broadly. For instance, declarations of an unindicted co-conspirator may be used against a charged conspirator. *See United States v. Asibor*, 109 F.3d 1023, 1033 (5th Cir. 1997). All that is required is evidence of a "concert of action, in which the defendant was a participant." *United States v. Dawson*, 576 F.2d 656, 659 (5th Cir. 1978) (internal citations and quotation marks omitted). Even statements made by an individual *prior* to joining the conspiracy are admissible so long as there is evidence of a "subsequent knowledge and willingness to participate" in the conspiracy. *United States v. Osgood*, 794 F.2d 1087, 1093 (5th Cir. 1986).

While "mere idle chatter," is inadmissible under this hearsay exception, the Fifth Circuit has upheld the admission of co-conspirator statements made *after* the criminal act. *See, e.g.*, *Dawson*, 576 F.2d at 658 (upholding introduction of testimony that "after the robbery, the robbers agreed to compensate the defendant for his help in the robbery"); *United States v. Broussard*, 80 F.3d 1025, 1039 (5th Cir. 1996) (it is not "mere idle conversation" to discuss "a significant event that threaten[s] the existence of the

conspiracy," as "statements seeking to control damage to an ongoing conspiracy and statements made in an attempt to conceal the criminal objects of the conspiracy" fall under this hearsay exception). Examples of statements falling under this Rule include those made by and to senior leaders of the Aryan Circle in order to keep them apprised of gang activity so that they could effectively direct the affairs of the enterprise. In support of the admission of co-conspirator statements, the government will introduce evidence sufficient to support a finding as to each of the four necessary factors using the contents of the declaration, together with independent evidence.

Where a co-conspirator statement is not made in furtherance of the conspiracy, it may still be admissible as a statement against penal interest under Federal Rule of Evidence 804(b)(3). The Fifth Circuit has construed, for example, statements evincing a co-conspirator's knowledge, assent to, or interest in covering up past conduct to be sufficiently against penal interest to warrant admittance either under Rule 804(b)(3) or even an "excited utterance" under Rule 803(2). *Ebron*, 683 F.3d at 136.

### 4. Statements Not Offered for the Truth of the Matter Asserted

The government will, at times, offer testimony not for the truth of the matter asserted, but for another relevant evidentiary purpose. Such testimony is not considered hearsay. *See United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981) ("Using an out-of-court utterance as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule."); *see also* Fed. R. Evid. 801(c) (defining hearsay as "a statement,

other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Out-of-court statements offered for the limited purpose of providing background information or explaining why a testifying witness did something (state of mind evidence such as motive or bias) is similarly not hearsay. *United States v. Gentle*, 361 F. App'x 575, 580-81 (5th Cir. 2010). The government intends to elicit such testimony during trial.

### E. Use of Demonstrative Evidence and Organizational Charts

The government intends to present one or more demonstrative aids to show the relationships between evidence and individuals about whom the jury will have heard testimony. Such aids are permissible, subject to regulation under Federal Rule of Evidence 611(a). Given the number of years covered by the indictment (over a decade), the number of individuals to be discussed, and the complex and evolving nature of the hierarchy and branches of the Aryan Circle, demonstrative aids, timelines, and organizational charts are a reasonable and routinely admissible tool.

The use of charts as "pedagogical devices intended to present the government's version of the case" is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a). *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000). Demonstrative aids are permissible to assist the jury in evaluating the evidence if the jury is warned beforehand that the charts are not independent evidence. *Id.* Moreover, under Federal Rule of Evidence 1006, summary charts based on evidence so voluminous that in-court review by the jury would be inconvenient may even be admitted into evidence. *Id.*

**F.  Use of Transcripts**

At trial, the government intends to introduce intercepted wiretap calls and recorded inmate jail calls. Like demonstrative evidence, the Fifth Circuit routinely permits the use of transcripts to accompany such audio recordings as an aid to the jury. *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976). Whether to admit transcripts is within the Court's discretion. *United States v. Chaney*, 299 F. App'x 447, 453 (5th Cir. 2008).

The Fifth Circuit prefers that parties stipulate to the accuracy of a transcript rather than holding independent hearings on the matter. *Onori*, 535 F.2d at 948. To that end, the government plans to provide defense counsel with copies of the proposed transcripts prior to trial. Nevertheless, "it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side…is given an opportunity to submit a transcript containing its version of the conversation." *Id*.

Transcripts may also be admitted into evidence and used during deliberations for "the limited purpose of aiding the jury in understanding the recording by identifying the speakers or understanding portions which are difficult to hear." *Id.* The government has proposed a limiting instruction to accompany the use of transcripts as suggested by the Fifth Circuit, namely that should the jurors perceive any differences between the recordings and transcripts, that the recordings should control. *See United States v. Larson*, 722 F.2d 139, 144 (5th Cir. 1983) (approving of limiting instructions). Accompanied by such a warning, the introduction and use of such transcripts should be without controversy.

### G. Authentication and Chain of Custody for Documentation and Recorded Evidence

As a condition precedent to the admission of evidence, the proponent of that evidence must satisfy the requirements for authentication. Federal Rule of Evidence 901 requires the government to "produce evidence sufficient to support a finding that the item is what [the government] claims it is." The Fifth Circuit has explained that the burden to authenticate is not high; it "merely requires some evidence in support." *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (internal quotation marks omitted); *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) ("The bar for authentication is not particularly high."). In the Fifth Circuit, once the government makes a *prima facie* showing of authenticity, "the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *United States v. Palella*, 846 F.2d 977, 981 (5th Cir. 1988); *see also United States v. Jardina*, 747 F.2d 945, 951 (5th Cir. 1984) ("The only requirement is that there has been substantial evidence from which they could infer that the document is authentic").

The government need not establish all links in the chain of custody of an item or call all persons who were in a position to come into contact with it. *See Menendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009). A break in the chain of custody influences only the weight of the evidence, not its admissibility. *United States v. Sparks*, 2 F.3d 574, 582 (1993); *see also United States v. Shaw*, 920 F.2d 1125, 1229-30 (5th Cir. 1991) ("This court has repeatedly held that any break in the chain of custody of physical evidence does

not render the evidence inadmissible but instead goes to the weight that the jury should accord that evidence.").

The most common way to authenticate a piece of evidence is through testimony by a witness with sufficient knowledge that the matter is what it is claimed to be. Fed. R. Evid. 901(b)(1). Many of the documents, physical evidence, and audio recordings the government will seek to introduce will be authenticated in this manner.

In addition, there may be documents for which no witness will be able to recall that the document was authored or received by him or her. The government may nevertheless properly authenticate such an exhibit pursuant to Rule 901(b)(4), which permits authentication when "the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" support a finding that the document is what the proponent claims it to be. *See United States v. Dean*, 989 F.2d 1205, 1210 n.7 (D.C. Cir. 1993) ("The rule contains an illustrative, but not exhaustive, list of suggested methods of identification.").

The government will also authenticate records through Rule 902(11), where certifications of the custodian of records or another qualified person show that the document meets the requirements of Rule 803(6)(A)–(C) and those certifications have been provided in discovery. Examples of evidence the government will admit with such certifications are medical and phone records with business records certifications from the institution or company that maintains such records in the regular course of business.

Among other evidence, the government intends to introduce Facebook posts belonging to the defendants and co-conspirators. The Fifth Circuit has affirmed the general

principles above as they relate to the authenticity of Facebook posts. *See United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (sufficient foundation where witness testified that she recognized the exhibits from previous familiarity with the defendant's Facebook account). Like other forms of evidence, "conclusive proof of authenticity," such as whether the individual in question authored a Facebook post "is not required for the admission of disputed evidence." *Id*. Further, other circuits have found that the content of the Facebook posts themselves can be used to authenticate the identity of its creator such as photographs, names, and other information. *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (court considered photos and links on the pages, posted biographical information, and "quotations and listings of their interests," among other factors); *United States v. Browne*, 834 F.3d 403, 440-442 (3d Cir. 2016) (holding that "circumstantial evidence can suffice to authenticate a document" and listing pieces of personal information taken from contents of Facebook accounts to support finding of proper authentication).

The government also intends to introduce audio recordings in which defendants and their co-conspirators discuss gang business and defendants make inculpatory statements. The same rules apply for authenticating such evidence—the government must only "produce evidence sufficient to support a finding that the item is what the [government] claims it is." Fed. R. Evid. 901(a).

Specifically, Rule 901(b)(5) provides as an example of proper authentication "[a]n opinion identifying a person's voice – whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice *at any time* under circumstances that connect it with the alleged speaker." The Fifth Circuit has long

permitted lay witnesses to identify voices in recordings based on personal familiarity. *United States v. Lampton*, 158 F.3d 251, 259 (5th Cir. 1998). All that is required is that the witness have "some familiarity with the voice which he identifies." *United States v. Cuesta*, 597 F.2d 903, 915 (5th Cir. 1979). Prior conversations are sufficient to satisfy Rule 901(b)(5). *Id*. Defense arguments that the witness has misidentified the speaker go to the weight to be placed on, not the admissibility of, the recording. *Lampton*, 158 F.3d at 259.

Similarly, calls recorded in either county jails or federal prisons may be admitted through those familiar with either the call participants or the system which records them. The Fifth Circuit has upheld the authentication of jail calls through testimony by a correctional officer who testified about how the inmates' calls were recorded and identified. *United States v. Arayatanon*, 980 F.3d 444, 450-51 (5th Cir. 2020). The government intends to introduce calls as well as intercepted inmate emails and letters through federal Bureau of Prisons ("BOP") custodians who know the recording system and who regularly review correspondence and listen to calls.

Finally, the government will introduce gang documentation such as Constitutions, guidelines, and newsletters through cooperating witnesses who are familiar with such materials or the indicia of such materials. The government will not necessarily call the authors or interceptors of each such exhibits, but rather will introduce these documents through the same standard articulated above by testimony that the item is what the government purports it to be. Fed. R. Evid. 901.

## H. Conditional Admissibility of Documentary and Recorded Evidence

The government requests that where an earlier witness can lay only part of the foundation for an exhibit, the Court permit the government to present its evidence through conditional admission pending later foundational witness testimony. This process significantly streamlines the presentation of evidence and minimizes juror confusion.

Conditional admissibility is a procedure contemplated by and provided for under the Federal Rules of Evidence. Rule 104(b) provides that: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." Courts commonly make such determinations. *See United States v. Bailey*, 444 U.S. 394, 413 n.9 (1980) ("We appreciate the fact that neither the prosecution nor the defense in a criminal case may put in all its evidence simultaneously, and to the extent that applicable rules of case law do not otherwise preclude such an approach, a district court is bound to find itself in situations where it admits evidence provisionally, subject to that evidence being later 'tied in' or followed up by other evidence that makes the evidence conditionally admitted unconditionally admissible"); *see also United States v. Anderson*, 933 F.2d 1261, 1273 (5th Cir. 1991) (noting court's discretion "to admit the evidence subject to proof of the preliminary facts") (internal citations and quotation marks omitted).

## VI. ADDITIONAL EVIDENTIARY AND TRIAL MATTERS

### A. Gang Membership is a Legitimate Basis for Cross-Examination

A witness's gang membership is a legitimate topic for cross-examination. *United States v. Abel*, 469 U.S. 45, 49-54 (1984) (holding that gang membership, as well as type of gang and its tenants, are permissible subjects for cross-examination for bias). Should any gang members (or, specifically, the defendants) take the stand, the government may appropriately cross-examine them along these lines.

The Court may, of course, impose reasonable limitations on cross-examination for bias "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also* Fed. R. Evid. 608, 609. Such limitations do not violate the Confrontation Clause. *See United States v. Jimenez*, 464 F.3d 555, 559 (5th Cir. 2006).

### B. Statements Taken While Defendants' Were in Prison or County Jails Do Not Violate *Miranda*

A large portion of the criminal conduct underlying the defendants' involvement in the RICO conspiracy stems from violence that took place while the defendants and their co-conspirators were incarcerated. As such, the government intends to present evidence of statements made by the defendants and co-conspirators to Federal Bureau of Prisons and local jail staff during and following such incidents.

The Fifth Amendment prescribes a series of warnings against self-incrimination to accompany custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). However,

prisoners are not automatically considered "in custody" for the purposes of *Miranda*. *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 114 (2010)). "When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation" to determine whether the circumstances of the interview "are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Howes v. Fields*, 565 U.S. 499, 514-515 (2012).

In the prison context, a prisoner is considered free to leave if he is free to "return to his normal life" within the prison. *Arellano-Banuelos*, 912 F.3d at 868 (citations omitted). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Fields*, 565 U.S. at 509. Just because a prisoner is taken from, for example, the exercise yard where a violent incident occurred, to an interview room, does not in and of itself mean that *Miranda* is necessary. *Id*. at 513. The realities of prison life "may necessitate some additional limitations on … freedom of movement." *Id*. "Isolation from the general prison population is often in the best interest of the interviewee and, in any event, does not suggest on its own the atmosphere of coercion that concerned the Court in *Miranda*." *Id*.

In accordance with these principles, the government intends to introduce at trial two statements made by LONG following the July 17, 2018 stabbing of B.L. and the September 11, 2018 stabbing of M.Q., statements which were both made while LONG was a prisoner at a federal prison located in Pennington Gap, Virginia.  The government also intends to

introduce a statement made by CHUNN following an attack he committed against an individual he believed to be cooperating with law enforcement in 2015 at a federal prison in Lewisburg, Pennsylvania. Additionally, the government intends to introduce a statement made by KENT while he was housed in the Parke County, Indiana jail in 2019.

Furthermore, evidence at trial will establish that some statements made by defendants while in custody were spontaneous and cannot be viewed as the product of interrogation. "The *Miranda* rule does not forbid the admission into evidence of spontaneously volunteered confession or statements by prisoners held in jail…simply because they happen, as prisoners, to already be in custody." *United States v. Powers*, 444 F.2d 260, 261 (5th Cir. 1971). Volunteered statements of any kind do not trigger the Supreme Court's interest in custodial interrogation. *Id*. Along these lines, the government intends to introduce testimony of spontaneous statements made by KENT following his arrest on this indictment which were made while he was awaiting extradition at the Parke County Sherriff's Office holding facility in Indiana.

### C. Improper Commentary on Missing Witnesses

The government does not intend to call every possible individual who witnessed a specific act in its case-in-chief. Absent a showing that the defense was precluded from obtaining the presence of said witness by defense subpoena, any argument or comment on the government's decision not to call a particular witness would be irrelevant and overly prejudicial. *See United States v. Cohen*, 631 F.2d 1223, 1227 (5th Cir. 1980); *United States v. Lamp*, 779 F.2d 1088, 1097 (5th Cir. 1986). Fed. R. Evid. 401, 402 and 403. While the Confrontation Clause guarantees that the defendant has an opportunity to cross-examine

the witnesses against him. This, however, is not a guarantee that the prosecution will call *all* potential witnesses against the accused. *See Cooper v. California*, 386 U.S. 58, 62 n. 2 (1967).

Where a witness is neither "peculiarly within [the government's] power to produce" nor "would provide testimony that will elucidate facts at issue," commentary on such witness's absence by either the Court or the defense is inappropriate. *United States v. Rios*, 636 F.3d 168, 171 (5th Cir. 2011); *see also United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009) ("the district court may not give an adverse inference instruction if the missing witness is 'equally available' to both parties," unless "one of the parties controls that witness and his testimony would elucidate facts at issue"). This is particularly true if the witness in question's "testimony would likely have been cumulative." *Id.* (citing *United States v. Jennings*, 724 F.2d 436, 446 (5th Cir. 1984)). Further, the type of "control" contemplated "is not physical custody…[r]ather it is some sort of connection to the party, such that one would expect that the missing witness's testimony would corroborate that party's theory of the case." *Santos*, 589 F.3d at 764; *see also United States v. Chapman*, 435 F.2d 1245, 1247 (5th Cir. 1970) (explaining that a witness's availability is not a physical concept so much as one determined by the witness's relationship to the parties and the "nature of the testimony that he might be expected to give").

At trial, the government intends to present evidence of several stabbings that took place within federal prisons. The victims of those stabbings—currently or formerly incarcerated rival gang members or inmates—are hesitant to cooperate and are no more within the government's control than available to the defense via subpoena. Especially

where a potential witness would likely be antagonistic, the Fifth Circuit has found it appropriate to deny missing witness instructions where the government does not call that witness at trial. *Rios*, 636 F.3d at 172 (citing both parties' "skepticism" over the witness's "merit" and the likelihood that his testimony would have been "cumulative or corroborative" of other evidence presented).

If defense counsel opts to make improper reference to a "missing" witness, the government may point out that the defense has the same subpoena power which, if accompanied by a limiting instruction from the Court on the burden of proof, is an appropriate line of argument. *United States v. Stephens*, 571 F.3d 401, 408 (5th Cir. 2009) (providing for such commentary).

### D. Direct Examination Regarding Existence of Plea Agreement

The government intends to call several cooperating witnesses testifying pursuant to written plea agreements. Fifth Circuit precedent permits the government to introduce such plea agreements into evidence during the direct examination of that witness. *See United States v. Edelman*, 873 F.2d 791, 795 (5th Cir. 1989) (permitting questioning of the witness regarding the contents of the plea agreement and then allowing it to be introduced into evidence). Given that defense counsel will have ample opportunity to cross-examine the witnesses about the plea agreement, any argument that entering it into evidence constitutes improper bolstering is negated. *Id*. Furthermore, that the plea agreements may include promises by the witness to "testify truthfully" is not improper. *Martino*, 648 F.2d at 389. This is distinguishable from improper witness vouching such as by declaring that

government's counsel "ha[s] already determined that [the witness's] testimony [is] truthful." *United States v. Sosa*, 897 F.3d 615, 620-21 (5th Cir. 2018).

### E. Past Recorded Recollections Are Admissible Under Rule 803(5)

As alleged in the indictment, the government will present evidence at trial involving incidents dating back to 2010 as well as enterprise evidence dating back even farther than that. Due to the passage of time, some witnesses may be unable to refresh their recollections from reports or notes taken contemporaneously with those incidents. Under those circumstances, the contents of those reports or notes may be read to the jury as a past recollection recorded under Federal Rule of Evidence 803(5).

Rule 803(5) allows the introduction of recorded recollections concerning:

> A record that:
> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
> (C) accurately reflects the witness's knowledge.

For admittance, the government must show that "the witness had insufficient recollection to enable him to testify fully and accurately at trial" and that "the recording reflected the witness' knowledge correctly when the matter was fresh in his memory." *United States v. Judon*, 567 F.2d 1289, 1294 (5th Cir. 1978). "[T]he record may be read into evidence," but "received as an exhibit only if offered by an adverse party." Fed. R. Evid. 803(5).

All factors will be met here. The witnesses to whom this will likely apply are BOP and medical personnel who will testify about matters they witnessed, who made reports contemporaneous to those events, and whose reports accurately reflected their knowledge

at that time. Thus, if viewing the report does not refresh one such witness's memory, Rule 803(5) will permit the report's contents to be read to the jury.

Respectfully submitted,

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF TEXAS

*/s/ Christopher Rapp*
CHRISTOPHER RAPP
Assistant United States Attorney
Arizona Bar No.: 025704
550 Fannin St., Suite 1250
Beaumont, Texas 77701-2237
(409) 839-2538
Christopher.T.Rapp@usdoj.gov

DAVID L. JAFFE, CHIEF
ORGANIZED CRIME AND GANG SECTION

*/s/ Rebecca R. Dunnan*
REBECCA R. DUNNAN
Trial Attorney
Organized Crime and Gang Section
New York Bar No: 5121249
1301 New York Avenue, NW, Suite 701
Washington, D.C. 20005
(202) 4355-5652
Rebecca.Dunnan@usdoj.gov

*/s/ Bethany Lipman*
BETHANY LIPMAN
Trial Attorney
Organized Crime and Gang Section
New York Bar No: 5325444
1301 New York Avenue, NW, Suite 701
Washington, D.C. 20005
(202) 431-9453
Bethany.Lipman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion was provided to the defendants through their counsel via ECF on the 27th day of September 2021.

*/s/ Christopher Rapp*
CHRISTOPHER RAPP
Assistant United States Attorney